UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X
:
NIKE, INC. and NIKE USA, INC.,                : 12 Civ. 2275 (PKC) (RLE)
:
                Plaintiffs,    :
: **AFFIDAVIT**
   -against-                              :
:
REEBOK INTERNATIONAL LTD.,                    :
:
                Defendant.     :
:
-----------------------------------------------------------X

COMMONWEALTH OF MASSACHUSETTS  )
                                               )ss:
COUNTY OF NORFOLK                      )

        KENNETH P. GAMBLE, being duly sworn, deposes and says:

        1.    I am a former National Football League player, and am currently a member of the National Football League Players Association. I am employed by Defendant Reebok International Ltd. ("Reebok"). My title is Vice President, Marketing. Specifically, I work in the division at Reebok referred to as the Sports Licensed Division. I have been with Reebok now for just over 10 years, and worked in my current Vice President position since September 2007. Prior to that promotion, I held two other Director level positions within the same group.

        2.    My responsibilities include coordinating sports licensing deals with professional sports leagues, the associations representing league players, and the marketing organizations affiliated with both the leagues and the players associations. Of specific relevance to this matter, I have been actively involved in Reebok's licensing deals with the National Football League ("NFL"), the National Football League Players Association ("NFLPA"), and the

National Football League Players Incorporated ("Players Inc.") -- the marketing affiliate of the NFLPA -- since 2005.

**National Football League Players Incorporated ("Players Inc.")**

3. My dealings with Players Inc. over the years have included contract extensions, negotiations regarding manufacture of apparel and other products, royalty reporting, business quarterly updates, planning, contract close-outs, special events planning, and various other matters of mutual interest to the NFL players and Reebok.

4. Until recently, my primary contact at Players Inc. was Pamela Adolph. Ms. Adolph resigned from Players Inc. in or around October 2011. Since that time, I have dealt with Keith Gordon, President of Players Inc.

**The Relevant License Agreement**

5. On September 15, 2010, Players Inc. and the Sports Licensed Division/adidas Group entered into a License Agreement, a copy of which is annexed to this Affidavit as Exhibit A (the "License Agreement"). In entering into the License Agreement, the Sports Licensed Division/adidas Group was acting on behalf of Reebok. Although the License Agreement was entered into on September 15, 2010, it was retroactive to March 1, 2009, and except for our continued sell-off rights (discussed below), it expired on February 28, 2012. In fact, the License Agreement was the third such agreement entered into between Reebok (or an affiliate) and Players Inc. The first agreement was signed November 3, 2004, was effective as of March 1, 2001, and ran to February 28, 2005. The second agreement was signed September 22, 2005, was effective as of March 1, 2005, and ran to February 28, 2009. Thus, on a continuous basis from March 1, 2001, through February 28, 2012, Reebok and Players Inc. were in a licensee/licensor relationship.

6.  Paragraph 3(A) of the License Agreement gives Reebok, as licensee, the right to utilize:

> the names, numbers, likenesses, pictures, photographs, voices, facsimile signatures, and/or biographical information ... of the NFL Players identified in paragraph 2(A) above ... in connection with the development, manufacture, distribution, promotion, advertising and sale of Licensed Products....

"Licensed Products" is defined in paragraph 1 to include all products set forth in Attachment A to the Agreement. Attachment A in turn includes "Jersey[s]," which term is defined as "any shirt or top that bears a player name, number, or both, and is made of a like material and is of a similar cut or style as that worn as part of a uniform in a football game."

7.  As indicated in the language quoted above, the license granted to Reebok by paragraph 3(A) of the Agreement covers any NFL player "identified in paragraph 2(A) above...." Paragraph 2(A) provides in pertinent part as follows:

> (A) <u>Rights to Licensed Marks.</u> NFL PLAYERS [the term that the License Agreement uses to define Players Inc.] represents that it is a licensing affiliate of the National Football League Players Association ("NFLPA"); that the NFLPA has been duly appointed and is acting on behalf of the football players of the National Football League who have entered into a Group Licensing Assignment, either in the form attached hereto as <u>Attachment B</u> or through the assignment contained in paragraph 4(b) of the NFL PLAYER CONTRACT, which have been assigned to NFL PLAYERS; and that in such capacity NFL PLAYERS has the right to negotiate this contract and the right to grant the rights and licenses described herein.

8.  Therefore, reading paragraphs 2(A) and 3(A) of the License Agreement together, it is clear that that contract, among other things, granted Reebok a license to manufacture football jerseys bearing the name and number of any NFL football player who was a party to a Group Licensing Assignment ("GLA") with NFLPA. It is my understanding that Reebok has the right to consider every NFL player who is a member of the NFLPA to be a party to such a GLA unless we receive notification that such player has opted-out of the GLA. Based

3

on research done at my direction, it is my understanding that Tim Tebow has always been a member of the NFLPA for his NFL career. As such, he has, for the past two years, been a signatory of the GLA with Players Inc. as I have not been informed that he has opted-out. His License Number is 42682. In fact, as discussed in more detail below, Reebok has been making royalty payments to the NFLPA on Mr. Tebow's behalf based upon products bearing his name sold since he first became a player in the NFL.

9. In addition to its rights under the License Agreement, Reebok also had the exclusive right to market NFL branded merchandise (including both the NFL logo and the logos, designs, and colors of individual teams) pursuant to a separate agreement between Reebok International Ltd., the Onfield Apparel Group, LLC (a subsidiary of Reebok) and the NFL (and various NFL entities) that expired (except for the provision of a sell-off period) on March 31, 2012. That Agreement is not attached to this Affidavit because it is my understanding that it is not part of the controversy that led to the filing of this action.

10. Taking the Licensing Agreement and the separate contract with the NFL together, Reebok had the exclusive right to produce official NFL merchandise bearing NFL team logos and colors (pursuant to the contract with the NFL) and player names and numbers (pursuant to the License Agreement at issue here). This exclusive right existed until February 28, 2012, while both contracts were in effect. However, as discussed below, after the expiration of the License Agreement, Reebok had rights in a sell-off period to embellish and sell product. However, in order to avoid any dispute about those rights and to be open in all of our dealings, we checked with both the NFL and Players Inc. to discuss how to service the high marketplace demand anticipated in March 2012 with respect to well-known players in team transition because of trades or free agency.

**The Nike License Agreement**

11. I am aware that Players Inc. entered into a new licensing agreement with Nike, which became effective March 1, 2012. It is also my understanding that Nike entered into a licensing agreement with the NFL. However, because Nike's agreement with the NFL did not become effective until April 1, 2012, Nike did not have the right to use the New York Jets team logo and colors on and immediately after March 21, 2012 -- the date Mr. Tebow was traded to the Jets. Therefore, Nike was not in a position to market Tebow/New York Jets jerseys or other apparel in the immediate aftermath of the trade. As a result, the NFL, the NFLPA, and Players Inc. were faced with a situation in which there would be no supply of product in the marketplace at the time of maximum demand. This unanticipated situation led directly to the events at issue in this lawsuit.

**Reebok's "Sell-Off" Rights Under the Licensing Agreement**

12. Although the License Agreement at issue here expired on February 28, 2012, Section 17(E) of that Agreement gave Reebok one hundred and fifty (150) days after the contract expiration (the "Sell-Off Period") "to dispose of and liquidate all inventory" (the "Sell-Off Rights").

13. Because of the Sell-Off Period, Reebok is the only entity that had the right to sell fully-licensed NFL apparel in the month of March 2012. Starting in April 2012, Nike and Reebok will have overlapping rights -- Nike will have the right to sell apparel under its new agreement, and Reebok will still have a few months in which it may sell off apparel manufactured under the License Agreement.

14. I understand that Nike has taken the position either that Reebok can only sell off merchandise based upon the NFL rosters as they existed on February 28, 2012 (the date

of the expiration of the term of the License Agreement), or that Reebok can only sell off jerseys and other products already made prior to February 28. However, I respectfully submit that there is nothing in the License Agreement that supports either position. In fact, the License Agreement contains no limitation on what merchandise Reebok has the right to sell between February 28 and the end of the relevant Sell-Off Period. It does not limit Reebok's Sell-Off Rights to jerseys that were already in existence on February 28, and it does not limit Reebok's right to decorate or imprint jerseys with player names and numbers that conform to the rosters as they existed at that time.

15. On the contrary, I believe that the Sell-Off Rights set forth in paragraph 17(E) of the License Agreement entitle Reebok to take a "blank" NFL team jersey and embellish/imprint it with the name of any player who is traded, or who changed teams because of free agency, at any time within the Sell-Off Period. That includes, without limitation, Peyton Manning and Tim Tebow. Mr. Manning's name and number can be used on Denver Broncos merchandise, and Mr. Tebow's name and number can be used on New York Jets merchandise. Any such merchandise can be sold at any time up to May 31, 2012.[1]

16. I understand that during his deposition testimony in this matter that took place on April 2, Keith Gordon, the President of Players Inc., took the position that Reebok's Sell-Off Rights under Section 17(E) of the License Agreement prevented it from adding any player names or numbers to blank jerseys (*i.e.*, jerseys with team logos but no specific player identification) that Reebok had on hand when the term of the License Agreement ended on February 28, 2012. I understand that Mr. Gordon supported his conclusion by asserting that in

---

[1] While the Sell-Off Period in the License Agreement extends through the end of July, 2012 (150 days from the expiration of the contract term in the Agreement), the reason that I believe May 31, 2012 to be the end of the Sell-Off Period as a practical matter is that that the end of our Sell-Off Period under the Agreement between Reebok and the NFL. Since Reebok's rights to use team logos derive from the Agreement with the NFL, no sales of apparel containing a team logo and a player name and number can be made after that date.

6

the operative language of Section 17(E) ("to dispose of and liquidate all inventory"), the use of the word "inventory" meant that Reebok was prohibited from making any changes of any kind or nature to the blank jerseys that it had on hand. This interpretation of the License Agreement by Mr. Gordon makes no economic sense to me. Neither Mr. Gordon nor anyone else ever articulated this interpretation to me, and I believe that it is incorrect. If Reebok was not permitted to affix player names and numbers to blank jerseys that it had on hand when the term of the License Agreement expired, the value of its Sell-Off Rights would be significantly diminished because jerseys without player names and numbers are worth far less than jerseys containing such information. In fact, jerseys without player names on them have little value at all in the NFL context.

### My March 2012 Conversations With Keith Gordon of Players Inc.

17. Nevertheless, because of Reebok's desire to terminate its partnership on good terms with the NFL, NFLPA, and Players Inc. -- and acting out of an overabundance of caution -- I sent an email to Keith Gordon on March 9, 2012 at 11:17 a.m. In that email, I asked him to call me. My purpose was to discuss the possibility of capitalizing on significant player movements that might occur during the NFL free agent season. This was a courtesy call, as I believed Reebok was squarely within its rights to print name and number jerseys and apparel reflecting any moving player's new team. However, to avoid any disputes down the road, I wanted to have an express grant of permission before doing so. In addition to our general practice of being honest and open in our business dealings, it was Reebok's intention to exercise extreme caution and care in our handling of the wind-down of our license agreements with both the NFL and Players Inc.

18. Later on that day of March 9, 2012 I called Mr. Gordon from my office again in order to let him know that I wanted to speak with him regarding Peyton Manning, whose rights had just been released by the Indianapolis Colts so that Mr. Manning was now a free agent. I wanted to discuss with Mr. Gordon the possibility of providing products for "hot market" situations, such as would occur in the market of whatever team Mr. Manning ultimately signed with. I wanted to discuss with Mr. Gordon the importance of introducing into the marketplace jerseys and t-shirts that would capitalize on the movement of NFL players widely known to be fan favorites. I believed that NFLPA and Players Inc. would want to capitalize on the opportunity to sell such jerseys in the immediate window following the signing of a popular player by a new team, and I expressed this belief to Mr. Gordon. I left him a voicemail message to call me back to discuss this topic.

19. Mr. Gordon responded by email at approximately 5:19 p.m., but we did not speak at that time. In his email, he stated that he was "uncomfortable" granting Reebok the rights to create new Peyton Manning jerseys because of the new agreement between Players Inc. and Nike. Because of the importance of this issue, I wanted to talk to Mr. Gordon personally. Therefore, I made numerous efforts to contact him.

20. Specifically, on March 12 (the Monday after the weekend that followed my earlier conversations and emails with Mr. Gordon), I emailed him at 6:17 a.m. that I would speak with him later that day. At 9:29 a.m., he responded by email and told me that he would be in meetings until 2:00 p.m. I emailed back to Mr. Gordon at 9:32 a.m. and told him I would reach out to him later in the day. At 5:51 p.m., I called both Mr. Gordon's office and his mobile phone but I did not reach him.

21. Mr. Gordon called me back on March 12 at 6:22 p.m., and we spoke about making jerseys with the name, number, and new team logo for Peyton Manning and any other popular moving players. He told me that he felt uncomfortable authorizing me to manufacture the jerseys because of Players Inc.'s new relationship with Nike and another manufacturer and new NFL licensee, VF Imagwear. However, he also informed me of his disappointment that Nike was not prepared to introduce product sooner than late April. He said that he had previous conversations with Nike about this delay, but to no avail. In response, I asked Mr. Gordon if he was really going to pass up the opportunity of getting supply into the marketplace of jerseys for popular moving players. I asked him to think of the fans, and also of the royalties that Players Inc. could earn if these jerseys were offered for sale at a time right after the players' moves, when demand was likely to be at its highest.

22. Mr. Gordon responded -- as he had in our first conversation -- that he needed to consult with Players Inc.'s in-house lawyer to see what they could do, and that he would get back to me. Mr. Gordon told me that he was going to consult with Ahmad Nassar of Players Inc.'s legal department about the question I had raised -- specifically, whether Players Inc. had any concerns with Reebok selling jerseys containing the names, numbers, and new team logos for players that moved.

23. Shortly after my conversations with Mr. Gordon described above, Randy Moss signed with the San Francisco 49ers. Therefore, as of this date there were two potential "hot properties" to discuss -- Peyton Manning and Randy Moss. I emailed Mr. Gordon on March 13 at 8:39 a.m. to ask if he was aware of this new development. I wanted to add Mr. Moss to the conversation because he had just signed with the 49ers the prior evening.

24. Because the situation was becoming more significant in that Peyton Manning and Randy Moss either had moved or were about to move to new teams, I emailed Mr. Gordon again at 4:34 p.m., asking if he had spoken to his attorney about the player movements, and whether they had issues with Reebok embellishing jerseys to reflect the new team affiliations. I wanted to talk to Mr. Gordon not only about Peyton Manning and Randy Moss, but also other player movement (for example, Brandon Marshall and Mario Williams) that had occurred or was expected.

25. On March 13 at 5:51 p.m., Mr. Gordon called me from his mobile phone, telling me that he had just landed in Chicago. During this call, Mr. Gordon advised me that Players Inc. was giving Reebok permission to move forward and create jerseys for the moving players provided that we abided by two new conditions: (i) there were to be no further communications on the subject and no submission of artwork for approval; and (ii) we had to keep the total number of new jerseys for moving players to fewer than five players.

26. Mr. Gordon told me that he had spoken to his legal department, and that the limitation to five or fewer was a way to protect Players Inc. under its agreement with Nike. He explained that the reason for the five player limitation was that if Reebok created jerseys for a greater number of players, Players Inc. could potentially be found to be in breach of its agreements with Nike and VF Imagwear. He told me that if Reebok was only making jerseys for five or fewer moving players, Players Inc. could argue that there was no violation of its new agreements, because Nike and VF Imagwear only had rights for six or more players.

27. I understand that in his April 2 deposition testimony, Mr. Gordon testified that when we spoke on March 13, he told me that if Reebok was to create any jerseys in March for any players who changed teams, it could only do so if it secured the right to manufacture

those goods directly from each player in question. I do not believe that Mr. Gordon ever made such a statement to me. If he had done so, I am certain I would have remembered it because this would have effectively negated our entire conversation. Moreover, if this was what Reebok had to do in order to create name and number jerseys for players who moved to new teams, we never would have commenced this project because it could not possibly be completed successfully in the time available.

28. The reason is that Mr. Gordon's statement to me that Players Inc. was giving Reebok permission to create jerseys for up to five moving players would have been meaningless if -- as Mr. Gordon has now apparently testified -- Reebok had to obtain separate permission from each of the players involved. It must be kept in mind that Mr. Gordon and I were talking in mid-March about the creation of jerseys in that very month. Obtaining separate permission from the individual players would have made it virtually impossible to create the products during this time frame.

29. In our March 13 conversation, I told Mr. Gordon that if Players Inc. had any concerns, Reebok would be willing to limit the number of name and number jerseys with the players' new team logos that we would produce. I believe that Mr. Gordon heard what I said, but he did not respond to me regarding a possible limitation on the number of jerseys. At the end of the conversation, I agreed to Mr. Gordon's conditions and the call ended. I have checked my call log on my Blackberry phone, which indicates that this call with Mr. Gordon lasted three minutes and fourteen seconds.

30. In my conversations with Mr. Gordon, I told him that it was my understanding that with respect to the movement of significant players in the month of March, Nike would have difficulty producing the new jerseys in a timely manner. For starters, Nike

could not produce anything before April 1, 2012 -- since its contract with the NFL authorizing it to use team colors and logos did not begin until that date. For this reason, and because of my understanding that it takes Nike longer to produce new products than it takes Reebok (which owns its own printing and embellishing facility), I told Mr. Gordon that it was my belief that Nike would not be able to ship new product until mid or late April at the earliest. Mr. Gordon confirmed to me that he also understood that Nike would not be able to ship newly ordered jerseys until sometime in mid to late April. In fact, as noted above, Mr. Gordon had expressed that concern to me at the outset.

31. In my conversations with Mr. Gordon, I mentioned the names of Peyton Manning, Randy Moss, and other players. However, I did not mention Tim Tebow's name in that, or any subsequent, conversation with Mr. Gordon because no one thought that Mr. Tebow would become a moving player until the Denver Broncos signed Peyton Manning.

32. On March 19, 2012, Peyton Manning signed with the Denver Broncos. Reebok initiated the production process at this time for new Peyton Manning/Denver Broncos t-shirts. However, we did not create any Peyton Manning/Denver Broncos football jerseys because we did not have any "blank" Denver Broncos jerseys left in stock. Ironically, we had no inventory because all Broncos blank jerseys had been used during the season to satisfy the heavy demand for Tim Tebow name and number Broncos jerseys.

33. On March 21, 2012, the Denver Broncos traded Tim Tebow to the New York Jets. This prompted huge interest in Mr. Tebow in the New York City area. When this happened, I saw Reebok's head of sales, Glen Giovanucci, in the office and told him that since we had approval to offer for sale new team jerseys for up to five players that were moving to new teams, I wanted to exercise those rights with respect to Mr. Tebow.

34. Because Reebok had "blank" New York Jets jerseys in stock, we initiated the production process for a line of Tim Tebow/New York Jets jerseys and t-shirts. Reebok had approximately 27,000 blank New York Jets jerseys in stock at the time, but took only 6,000 blank ones and added Mr. Tebow's name and number through embellishment, and then offered those products for sale.

### The Youth Apparel on Which Plaintiff Bases Its Preliminary Injunction Motion

35. I am informed that in the papers that it filed in this Court in support of its motion for a preliminary injunction, Nike included evidence (consisting of photographs and an actual jersey) of youth-size Tim Tebow/New York Jets jerseys that were being offered for sale at Modell's in New York City. I respectfully submit that it would be wrong for the Court to base its decision on these products because they were not created by Reebok.

36. Not every Tebow/Jets officially licensed product on the market as of the filing of this action was created by Reebok. Most significantly, all youth apparel was created by a Reebok sub-licensee, Outerstuff Ltd. However, it is my understanding that Outerstuff also has its own license with Players Inc., and that Outerstuff will be working with Nike as Nike's sub-licensee for youth apparel.

37. I have reviewed the pictures annexed as Exhibit F to the Declaration of Paul Sarkozi in support of Nike's motion. These are pictures of youth shirts that were not produced by Reebok. Even though they bear the Reebok logo, they were produced by Outerstuff.

### The Group License Issue

38. There is one additional issue that I would like to address. It is my understanding that at the hearing held on March 28 on Nike's application for a temporary

13

restraining order, counsel for Nike argued that the only rights that Reebok acquired pursuant to the Licensing Agreement were "group rights" entitling it to produce products bearing names, numbers, and identifying material for six or more players, and that the License Agreement gave Reebok no rights to produce apparel for an individual player. But the fact is that Reebok has manufactured name and number jerseys for hundreds of NFL players during each of the last ten years, including jerseys and other apparel specific to players who move from team to team.

**Individual Player Licenses**

39.   My understanding is that Nike's arguments in support of its motion for a preliminary injunction are based in part on the fact that it has a separate license agreement with Mr. Tebow himself. However, I respectfully submit that that agreement has no relevance here, because Mr. Tebow's status as a member of the NFLPA (*supra*, ¶ 8) means that he was not authorized to license his name and number in combination with NFL logo marks on an exclusive basis to any manufacturer of apparel. The reason is that Mr. Tebow's membership in the NFLPA conveyed to that organization the right to grant such a license.

40.   My understanding of the reasons a manufacturer might enter into a separate agreement with a star player -- such as Reebok has with Peyton Manning, and Nike has with Mr. Tebow -- is in order to authorize the manufacturer to associate specific products with the player's likeness. To use Peyton Manning as an example, while Reebok has an exclusive licensing agreement with him, Reebok's rights to market Peyton Manning jerseys and t-shirts that bear NFL team names and logos did not derive from that contract. Rather, they derived from the Licensing Agreement at issue in this lawsuit. For this reason, as of April 1, any newly-manufactured Peyton Manning/Denver Broncos jerseys will be Nike products -- even though Reebok still has an exclusive contract with Peyton Manning that deals with other subjects. It is

Nike that now has the licensing agreement with Players Inc., and therefore Nike that now has the right to use Mr. Manning's name and number on jerseys.

**The Sales of Tebow Apparel**

41. Pursuant to Reebok's Sell-Off Rights and the conversation that I had with Mr. Gordon on March 13 (both of which are described above), Reebok embellished approximately 6,000 jerseys and 25,000 t-shirts with the New York Jets logo and Mr. Tebow's name and number.

42. It is my understanding that at the hearing held on March 28 on Nike's application for a temporary restraining order, the Court stated (Tr. 18:5-12) that "the good will of being associated with this hot NFL property" (referring to Mr. Tebow) might be a sufficient basis to find that irreparable injury exists here so as to justify the grant of a preliminary injunction. Later in the transcript, in explaining its initial conclusion that Nike had shown irreparable harm, the Court stated (Tr. 27:16-28:2) that "there is real value to Reebok or to Nike to be associated with this star player who has a following beyond even Denver or New York fans. And to have either the Nike logo or the Reebok logo associated with Tim Tebow would be a great value to either."

43. I believe that the above statements by the Court are at variance with what the evidence in this case shows. First, as discussed above, the only apparel and pictures that Nike introduced at the March 28 argument consisted of youth apparel. And as discussed above, that apparel was created by Outerstuff Ltd., which had its own agreement with Players Inc.

44. With regard to the adult size jerseys that were created by Reebok itself, we have learned that in excess of 87% were sold **without any Reebok name or logo**. As explained in the accompanying Affidavit of Blake Lundberg, the General Manager of Reebok's

15

Indianapolis manufacturing and distribution facility, the derivation of this figure is as follows: of the total of 6,000 jerseys, 13% of them (approximately 780) were size XXL. Of these 780 jerseys, some bore a Reebok logo, and others did not. Mr. Lundberg does not know how many of these 780 jerseys bore the Reebok logo, but even if it be conservatively assumed -- contrary to the fact -- that all did, this would still mean that 87% of the jerseys did not.

45. With regard to the approximately 25,000 t-shirts at issue here, Mr. Lundberg's Affidavit makes clear that **none** of those garments bore any Reebok name or logo.

46. Thus, to the degree that the Court made a preliminary finding of irreparable injury at the March 28 hearing, it is respectfully submitted that there is no evidentiary support. The fact is that fewer than 800 of the total of 6,000 jerseys -- and none of the 25,000 t-shirts -- contained any Reebok name or logo. Therefore, to the degree that any rights of Nike were violated by Reebok's conduct (which Reebok denies), money damages would be full compensation.

_____
Kenneth P. Gamble

Sworn to before me this
3 day of April 2012

_____
Notary Public