UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                          :

NIKE, INC. and NIKE USA, INC.,        :  12 Civ. 2275 (PKC) (RLE)
                          :
           Plaintiffs,        :
                          :
     -against-           :
                          :
REEBOK INTERNATIONAL LTD.,     :
                          :
          Defendant.       :
                          :
-------------------------------------------------------------X

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

**STILLMAN & FRIEDMAN, P.C.**
**425 Park Avenue**
**New York, New York 10022**
**(212) 223-0200**

# TABLE OF CONTENTS

PAGE

TABLE OF CASES ....................................................................................... iii

Preliminary Statement.................................................................................1

Statement of Facts.......................................................................................2

ARGUMENT ...............................................................................................5

PLAINTIFF HAS FAILED TO SATISFY THE REQUIREMENTS
FOR PRELIMINARY INJUNCTIVE RELIEF.............................................5

I.      Nike Is Not Likely to Succeed on the Merits..................................................5

        A.      Reebok is Authorized to Issue Tim Tebow Merchandise
                Under Its License Agreement With Players Inc. .................................5

        B.      Reebok Received an Oral License From the President of
                Players Inc. to Use Player Names and Numbers Until
                the End of March ........................................................................7

        C.      Reebok Acted Reasonably in Relying On the Players Inc.'s Grant
                of a License to Sell the Jerseys of Moving Players in March 2012 ....................7

        D.      Nike Cannot Sue Reebok for Alleged Misappropriation
                of Tim Tebow's Name .................................................................8

        E.      Nike's Agreement With Mr. Tebow Does Not Give It the Right
                to Use His Name and Number on a Jersey Containing NFL
                and Team Logos........................................................................9

        F.      Nike Fails to State a Claim For Tortious Interference With
                Prospective Business Relations.......................................................10

II.     Nike Has Failed to Show That It Would Suffer Irreparable Harm Unless
        a Preliminary Injunction is Granted.............................................................11

        A.      There Has Been No Irreparable Injury Because Reebok's Sales
                of a Small Quantity of Tebow/New York Jets Jerseys is Unlikely
                to Have a Significant Impact on Nike's Eventual Sales .....................11

        B.      There Has Been No Irreparable Injury to Nike Based Upon
                Reebok's "Association" With Mr. Tebow.......................................12

C.  The Fact That Plaintiffs Are Unlikely to Succeed in Showing
Trademark Infringement Is a Further Basis to Conclude That
There Is No Irreparable Harm ........................................................................ 13

III.  Nike Has Failed to Show That the Balance of Hardships Tips in Its Favor ................ 13

IV.  Nike Has Failed to Show That the Public Interest Would Be
Served By the Issuance of a Preliminary Injunction ...................................... 14

CONCLUSION ........................................................................................................ 14

# TABLE OF CASES

**PAGE**

**Cases**

*Carvel Corp. v. Noonan, et al.*, 3 N.Y.3d 182, 785 N.Y.S.2d 359 .............................................10

*Christian Dior-New York, Inc. v. Koret, Inc.*, 792 F.2d 34 (2d Cir. 1986)..................................8

*Dessert Beauty, Inc. v. Fox*, 568 F. Supp. 2d 416 (S.D.N.Y. 2008),
    *aff'd*, 329 F. App'x 333 (2d Cir. 2009)........................................................................10

*eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006).........................................................1

*Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60 (2d Cir. 2007)...........................11

*NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc.*, 87 N.Y.2d 614,
    641 N.Y.S.2d 581 (1996).............................................................................................10

*Pirone v. MacMillan, Inc.*, 88 Civ. 3173 (PNL), 1989 WL 230549, at *3
    (S.D.N.Y. June 28, 1989), *aff'd*, 894 F.2d 579 (2d Cir. 1990).....................................8

*Rosemont Enters. Inc. v. Random House, Inc.*, 58 Misc.2d 1
    (N.Y. County Sup. Ct. 1968), *aff'd*, 32 A.D.2d 892,
    301 N.Y.S.2d 948 (1969)..............................................................................................8

*Ryan v. Volpone Stamp Co., Inc.*, 107 F. Supp. 2d 369 (S.D.N.Y. 2000) ................................6

*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010) ........................................................................1

*Sasson Jeans, Inc. v. Sasson Jeans, L.A., Inc.*, 632 F. Supp. 1525 (S.D.N.Y. 1986) ...........7, 13

*Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008) ............................................................1

This Memorandum is submitted by Defendant Reebok International Ltd. ("Reebok") in opposition to the motion for a preliminary injunction made by Plaintiffs Nike, Inc. and Nike USA, Inc. (collectively, "Nike"), and in support of Reebok's application that this Court vacate the temporary restraining order that it issued in this matter on March 28, 2012.

**Preliminary Statement**

Reebok respectfully submits that the motion for a preliminary injunction should be denied. Preliminary injunctions are "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008). Because of the drastic nature of preliminary injunctive relief, such an injunction should not be granted unless the movant -- which has the burden on each element -- demonstrates the following: (1) that it is likely to succeed on the merits of the action; (2) that it has suffered an irreparable injury for which monetary damages would not be adequate compensation; (3) that the balance of hardships between the parties is in favor of the movant; and (4) that the public interest would be served by the issuance of an injunction. *See eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). The above requirements are serious and substantive, and should be examined carefully by the Court. *See Salinger v. Colting*, 607 F.3d 68, 79 (2d Cir. 2010).

As discussed below, it is respectfully submitted that Nike cannot satisfy any of the elements required for preliminary injunctive relief. While Nike made an attempt to satisfy those elements in its papers and at the March 28 hearing held by the Court on the TRO application, the situation has changed drastically since that time. The reason is that Reebok has now had the opportunity to gather the relevant evidence, and obtain relevant affidavits and deposition testimony.

That process has revealed the following key facts:

- Almost 90% of the Tim Tebow New York Jets name and number jerseys bore **no Reebok name or logos,** and none of the t-shirts had any reference to Reebok.

- Therefore, there is little likelihood that purchasers of those goods would associate Reebok with Tim Tebow, or that Reebok would benefit from the public's positive feelings toward Mr. Tebow if the Court permits the sales of that apparel to resume.

- As the Court stated at the March 28 Temporary Restraining Order hearing, unless this case presents the "good will of being associated with this hot NFL property … all we're talking about is sales of jerseys and that's not necessarily an appropriate basis for injunctive relief." (March 28, 2012 Transcript ["Tr."], 18:11 - 19:12.)

- The apparel with the Reebok logos on which Nike based its preliminary injunction papers and its presentation to the Court at the TRO hearing was **not created by Reebok.**  Rather, it was created by an independent company which had its own relationship with the National Football League and its players.

- There is agreement between the two witnesses in this case that in March 2012, they discussed Reebok marketing jerseys and t-shirts bearing the names, numbers, and new team logos for up to five players who changed teams during this period.

- While the two witnesses differ in important respects on precisely what was said about that subject in their conversations, the recollection of the conversations by Kenneth Gamble of Reebok makes more logical and economic sense than the version testified to by Keith Gordon of National Football League Players Incorporated ("Players Inc.").

## Statement of Facts

The facts regarding this action are set forth in the accompanying Affidavits of Kenneth Gamble, Blake Lundberg, and Sol Werdiger, and will not be repeated here.  As discussed in those Affidavits, this case presents a situation in which Nike is seeking to interfere with Reebok's exercise of its contractual rights under a Licensing Agreement that existed between Reebok and Players Inc., and under an oral agreement entered into between Reebok and

Players Inc. when the contract term of the Licensing Agreement had expired but Reebok was in the process of exercising its "sell-off rights" under that Agreement.

Pursuant to the Licensing Agreement and the subsequent oral agreement with Players Inc., Reebok manufactured approximately 6,000 football jerseys and 25,000 t-shirts bearing the logos of the New York Jets and the NFL, and the name and Jets number of Tim Tebow. Of those items, only approximately 400 of the jerseys contained Reebok's own name or logo. Neither the remaining 5,600 jerseys, nor any of the 25,000 t-shirts, contained any words or marks that associated those products with Reebok. (Gamble Aff., ¶¶ 44-45; Lundberg Aff., ¶¶ 5-9.)

Contrary to Nike's assertions (*e.g.*, Burdette Declaration, ¶ 14; Tr. 14:8-11), this is not a case about Reebok's misappropriation of Nike's right to capitalize on its investment in Tim Tebow and his brand. In fact, as the Gamble Affidavit makes clear -- and as all of the deposition testimony confirmed -- the possibility of creating a New York Jets jersey bearing Mr. Tebow's name and number was not even on the horizon at the time of the relevant communications between Mr. Gamble (acting for Reebok) and Keith Gordon (acting for Players Inc.). The reason is simple. At the time of those communications -- between March 9 and March 13 -- Mr. Tebow was still a member of the Denver Broncos. No one anticipated that he would be traded by that team because the Broncos had not yet signed Peyton Manning.

Therefore, as Mr. Gamble's Affidavit makes clear, his conversations with Mr. Gordon were not player-specific, with the sole exception of Mr. Manning. Rather, Mr. Gamble informed Players Inc. that in the month of March, Reebok would be offering for sale apparel bearing the names and numbers of players who moved from one NFL team to another during that

period.  Mr. Gamble was not specific about other players because at that time, there was no way to know what other players, if any, would be changing teams.

As stated in Mr. Gamble's Affidavit (¶¶ 12-16), it was his belief that Reebok did not need the permission of Players Inc. to create such apparel because it had the right to do so under the sell-off provision of the Licensing Agreement.  However, Reebok wanted to act in an open and above-board manner in winding down its contractual relationships with the NFL and Players Inc., and therefore Mr. Gamble kept Mr. Gordon informed of exactly what Reebok was contemplating.  (Gamble Aff., ¶¶ 17-18.)

Mr. Gamble and Mr. Gordon had more than one conversation about this matter.  In the course of those conversations, Mr. Gamble made the point that because Nike did not have the right to sell apparel with NFL team names and/or logos at any time before April 1 -- and because even with that right, Nike did not intend to begin such sales until the end of April -- Players Inc. would be losing out on an important opportunity to market jerseys and obtain royalties during the March and April time period when players were moving from one team to another.  (Gamble Aff., ¶ 21.)  Mr. Gordon agreed with Mr. Gamble's economic analysis, and stated that he had discussed this matter with Nike but been unable to solve the problem.  (Gamble Aff., ¶ 21.)

In their conversation on March 13, 2012, Mr. Gordon told Mr. Gamble that Players Inc. was giving Reebok permission to create jerseys for players who moved from one team to another provided that Reebok adhered to two conditions: (i) there were to be no further communications on the subject; and (ii) Reebok could only create such apparel for five or fewer moving players.  (Gamble Aff., ¶ 25.)  In the same conversation, Mr. Gordon stated that he had discussed this matter with Players Inc.'s legal department, and that the five player limitation was

adopted in order to avoid any claim that Players Inc. was acting in violation of its new agreement with Nike.

In his deposition in this matter on April 2, Mr. Gordon acknowledged his conversations with Mr. Gamble, but denied that he ever gave Mr. Gamble Players Inc.'s approval to manufacture apparel for any player moving from one team to another.  Rather, Mr. Gordon claimed that he told Mr. Gamble that in order for Reebok to manufacture a jersey of any such player, Reebok had to obtain individual permission from that player himself.  (Gordon Deposition Transcript [Friedman Aff., Exh. D.)  We respectfully refer the Court to paragraph 16 of Mr. Gamble's Affidavit, which states that he has no recollection of Mr. Gordon making any such statement to him, and that if it had been made, he would certainly have remembered it because it would have undercut the value of the consent that he believed Mr. Gordon was giving him.

## ARGUMENT

### PLAINTIFF HAS FAILED TO SATISFY THE REQUIREMENTS FOR PRELIMINARY INJUNCTIVE RELIEF

**I.    Nike Is Not Likely to Succeed on the Merits**

**A.    Reebok is Authorized to Issue Tim Tebow Merchandise Under Its License Agreement With Players Inc.**

From March 2001 into the first quarter of this year, Reebok -- operating under grants of license from both the NFL and Players Inc. -- has been the exclusive provider of officially licensed adult NFL jerseys.  In that capacity, Reebok has printed officially licensed jerseys bearing the team logos and individual names and numbers of hundreds of players.

From the time that Mr. Tebow joined the NFL, Reebok's rights under its licenses with the League itself and Players Inc. authorized it to manufacture jerseys with the logo of his team, and his own name and number.  Such authority is found in the fact that Mr. Tebow is a

member of the NFL Players Association ("NFLPA").  Reebok has the right to consider every player who is a member of the NFLPA to be a party to the License Agreement between Players Inc. (which acts on behalf of the NFLPA) and Reebok itself.  Given that Mr. Tebow has been a member of the NFLPA since he has been in the league, Reebok did not need any permission to use his name and number other than the License Agreement itself.  (Gamble Aff., ¶ 8.)

Moreover, nothing in the License Agreement requires Reebok to obtain a new grant of authority when a player moves from one team to another.  If Reebok had the right to sell a jersey bearing Mr. Tebow's name on February 28, 2012, it had the right to do so throughout the sell-off period, regardless of what team he was on.  *See Ryan v. Volpone Stamp Co., Inc.*, 107 F. Supp. 2d 369, 385 (S.D.N.Y. 2000) (holding that defendant's right to act lapsed on the termination of the licensing agreement, but basing this holding on the fact that the "license … is … silent as to liquidating left over inventory.").  Here, the License Agreement explicitly granted Reebok the right to liquidate leftover inventory.

The Court in *Volpone* noted the same concern that this Court did at the March 28 TRO hearing stating that: "if a licensee could sell inventory manufactured during the term of the license over an indefinite period after its termination or expiration, the expiration date would have little force or meaning.  One can imagine a scenario where a licensee intentionally creates a large surplus and thereby grants to itself a de facto extension of the license." *Id.*  But as we noted at that hearing in response to the Court's concern, Reebok makes no claim to such a right to sell for an "indefinite period after … expiration."  Rather, the License Agreement itself sets a July 31 deadline for Reebok's right to liquidate, and -- as a practical matter -- the real deadline is even shorter because Reebok's sell-off right under its agreement with the NFL expires on May 31. (Gamble Aff., ¶ 15.)

**B.**  **Reebok Received an Oral License From the President of Players Inc. to Use Player Names and Numbers Until the End of March**

As described above, Reebok retained its right to print players' names and numbers throughout the sell-off period following the termination of the License Agreement. Nevertheless, and in an abundance of caution, Reebok sought the approval of Players Inc. to issue jerseys for players who moved from one team to another during the month of March. We respectfully refer the Court to the Affidavit of Mr. Gamble, which contains a full description of his discussions with Mr. Gordon on that issue.

**C.**  **Reebok Acted Reasonably In Relying On the Players Inc's Grant of a License to Sell the Jerseys of Moving Players in March 2012**

Reebok acted reasonably in relying on Keith Gordon's grant of permission in mid-March in view of: Mr. Gordon's authority as President of Players Inc.; the sell-off provision in the License Agreement that applied to jerseys that Reebok already had on hand; and Mr. Gordon's statements of his concern about Nike not getting new jerseys to the market until the end of April. *See Sasson Jeans, Inc. v. Sasson Jeans, L.A., Inc.*, 632 F. Supp. 1525, 1526 (S.D.N.Y. 1986) (finding no trademark infringement when trademark owner first revoked license to use mark, then authorized previous licensee to sell ship 870,000 additional units.).

In March 2012, Nike did not have a license to produce Tebow name and number New York Jets jerseys. Therefore, up to and including the time it filed this action, Nike could not produce any apparel bearing the logos of the NFL and the New York Jets, and the name and number of Mr. Tebow. This inability on Nike's part -- which was aggravated even further by Nike's expressed intention not to begin its marketing of NFL jerseys until the end of April (Gamble Aff., ¶ 21) -- provides further support for the reasonableness of Reebok's reliance on Mr. Gordon's statements to Mr. Gamble.

In fact, in view of the reasonableness of Reebok's reliance on the March 13, 2012 conversation between Mr. Gamble and Mr. Gordon, Nike should be estopped from arguing that Reebok had no right to create new team jerseys for up to five players who changed teams during March. *See Christian Dior-New York, Inc. v. Koret, Inc.*, 792 F.2d 34, 37-39 (2d Cir. 1986) (finding licensor estopped from arguing trademark infringement when it had asked licensee's representatives to continue "business as usual").

### D.   Nike Cannot Sue Reebok for Alleged Misappropriation of Tim Tebow's Name

At the Temporary Restraining Order argument on March 28, Nike counsel stated to the Court that

> from Mr. Tebow's point of view, he's made a choice about how he wants to be identified and how he wants to commercialize his celebrity and this is through his agreement with Nike. And his agreements are also at work here, his unique celebrity and fame. And of course, we're standing in his shoes to some extent subject to our license. We're here representing his celebrity interests and he has that right and it's being thwarted as well.

(TRO Hearing, Tr. 16-21, March 28, 2012.) This comment is entitled to little weight because Nike has no standing to assert any such claim on Mr. Tebow's behalf.

Nike characterizes its trademark infringement claims as claims for Reebok's misappropriation of Mr. Tebow's right to privacy. However, such a claim cannot be the basis for injunctive relief because Nike has no standing to bring such a cause of action. The reason is that the right of publicity is not assignable by the person to whom that right belongs. *See Pirone v. MacMillan, Inc.*, 88 CIV. 3173 (PNL), 1989 WL 230549, at *3 (S.D.N.Y. June 28, 1989), *aff'd*, 894 F.2d 579 (2d Cir. 1990) ("[T]he right to privacy established under Sections 50 and 51 of the Civil Rights Law is personal, and may not be asserted by others."); *Rosemont Enters., Inc. v. Random House, Inc.*, 58 Misc. 2d 1, 7 (N.Y. County Sup. Ct. 1968), *aff'd*, 32 A.D.2d 892, 301 N.Y.S.2d 948 (1969) ("[P]laintiff, in any event, has no standing to assert another's right of

8

privacy under article 5 of the New York Civil Rights Law which is specifically relied upon in its complaint…. [S]uch right is a purely personal one which may be enforced only by the party himself.").

The simple fact is that Mr. Tebow has made no claim against Reebok, and Nike's attempt to bootstrap its own claim by referring to his supposedly violated rights should be disregarded.

E.   **Nike's Agreement With Mr. Tebow Does Not Give It the Right to Use His Name and Number on a Jersey Containing NFL and Team Logos**

Contrary to the assertion in the March 27, 2012 Declaration of Tim Tebow's lawyer, Wendy Kirk, Tim Tebow has not "granted Nike the exclusive right to use his name in connection with athletic apparel."  In fact, Mr. Tebow, as a signatory of the Group Licensing Assignment of the NFL Players Association, granted to the NFLPA the "the exclusive right to use and to grant to persons, firms, or corporations, (collectively "licensees") the right to use his name, signature, facsimile, voice, picture, photograph, likeness and/or biographical information (collectively "image") in group licensing programs."  *See* Group Licensing Assignment annexed as Exhibit 1 to Declaration of Keith Gordon.  Mr. Tebow's separate endorsement agreement with Nike relates to his "exclusive use of NIKE products, and NIKE's use of your endorsement in our advertisement and promotion."  *See* March 24, 2010 Tebow/Nike Letter Agreement, annexed as Exhibit 2 to March 27, 2012 Declaration of Wendy Kirk.  However, that agreement is not a grant of a license to Nike to use Mr. Tebow's name and number.  Mr. Tebow could not license that right to Nike because he had already licensed it to Players Inc. by signing the NFLPA Group Licensing Agreement.

**F.    Nike Fails to State a Claim For Tortious Interference With Prospective Business Relations**

Plaintiffs' lack of likely success on the merits is further undercut by their failure to state a claim for tortious interference with prospective business advantage.    First, the Complaint's conclusory allegations fail to allege any specific business relations that have been harmed other than fans in general or the world at large.   This is too broad to sustain a claim. *See Dessert Beauty, Inc. v. Fox*, 568 F. Supp. 2d 416, 429 (S.D.N.Y. 2008) (Chin, J.) *aff'd*, 329 F. App'x 333 (2d Cir. 2009) (dismissing tortious interference with business relations claim brought by competitor because Plaintiff "has not identified any third party or any prospective business relation with which [Defendant] interfered….   Instead, it argues that [Defendant] spread 'unfounded claims to the world'.   But the public and customers at large are far too general to constitute a specific third party for purposes of a tortious interference claim").

Moreover, the Complaint also lacks the requisite allegation of "wrongful means." Where interference with a business relationship is alleged, the defendant must be shown to have interfered by "wrongful means." *NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc.*, 87 N.Y.2d 614, 621, 641 N.Y.S.2d 581, 585 (1996).   As the New York Court of Appeals has explained, "as a general rule, the defendant's conduct must amount to a crime or an independent tort ... to create liability for interference with prospective contracts or other nonbinding economic relations." *Carvel Corp. v. Noonan, et al.*, 3 N.Y.3d 182, 190-191 (defining "wrongful means" as physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure) (quotation marks and citation omitted).[1]

---

[1]      A limited exception to the crime/independent tort rule is where "a defendant engages in conduct for the sole purpose of inflicting intentional harm on plaintiffs." *Id.* at 190, 785 N.Y.S.2d at 362 (quotation marks and citation omitted).

II.     **Nike Has Failed to Show That It Would Suffer Irreparable Harm Unless a Preliminary Injunction is Granted**

To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer "an injury that is neither remote nor speculative, but actual and imminent," and one that cannot be remedied by an award of monetary damages. *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007). Nike can make no such showing here.

A.      **There Has Been No Irreparable Injury Because Reebok's Sales of a Small Quantity of Tebow/New York Jets Jerseys is Unlikely to Have a Significant Impact on Nike's Eventual Sales**

As set forth in the Gamble Affidavit and the testimony of Glen Giavanucci (Friedman Aff., Exh. A), Reebok sold 6,000 Tebow/New York Jets jerseys. If Reebok was intending to flood the market so as to injure Nike, it certainly would have created a greater quantity of Tebow jerseys. In fact, at the time of the trade, it had the ability to create up to 21,000 Tebow/New York Jets jerseys, because that was the number of blank jerseys that Reebok had in stock. (See Transcript of Deposition Testimony of John Warren [Friedman Aff., Exh. C].)

Moreover, the 6,000 Tebow/New York Jets jerseys that Reebok sold is a quantity that is insignificant compared to the high volume of sales of Tebow jerseys when Mr. Tebow was a member of the Denver Broncos. It is hard to imagine that such a relatively small sales figure could have a material impact on the number of Tebow jerseys that Nike will be able to sell over the life of its licensing agreement with Players Inc. But the important point to note here is that even if such an impact on Nike sales was both material and ascertainable, this would only entitle Nike to money damages, and not to injunctive relief.

**B.**   **There Has Been No Irreparable Injury to Nike Based Upon Reebok's "Association" With Mr. Tebow**

At the TRO hearing, the Court stated (Tr. 18:5-12) that "the good will of being associated with this hot NFL property" (referring to Mr. Tebow) might be a sufficient basis to find that irreparable injury exists here so as to justify the grant of a preliminary injunction.   Later in the transcript, in explaining its preliminary conclusion that Nike had shown irreparable harm, the Court stated (Tr. 27:16-28:2) that "there is real value to Reebok or to Nike to be associated with this star player who has a following beyond even Denver or New York fans.   And to have either the Nike logo or the Reebok logo associated with Tim Tebow would be a great value to either."

However, as set forth in the Affidavits of Blake Lundberg and Mr. Gamble submitted by Reebok in opposition to Nike's motion, there is no factual basis for the Court's concern.   While we were unaware of the facts at the time -- because we were served with Nike's motion papers only a few hours before the TRO argument -- we now know that only a small portion of the garments sold by Reebok bearing Mr. Tebow's name and number had Reebok's own logo or name on them.   We respectfully refer the Court to Mr. Lundberg's Affidavit, which shows as follows: of the 6,000 jerseys sold by Reebok, only a maximum of 780 (and probably even less than that) bore Reebok's logo or name, and none of the 25,000 t-shirts sold by Reebok had its name, logo, or any other identifying material.

Moreover, our investigation subsequent to the TRO hearing also brought out the true facts regarding the youth apparel of which Nike included pictures in its moving papers, and of which it tendered a sample to the Court at the TRO hearing.   As set forth in the annexed Affidavit of Sol Werdiger, those youth size garments which Nike brought to Court were made by Outerstuff Ltd. (Mr. Werdiger's own company).   While those garments had Reebok logos, the

decision to affix them was made by Mr. Werdiger.  Such a decision by an independent third party provides no basis for the issuance of injunctive relief against Reebok.

**C.**     **The Fact That Plaintiffs Are Unlikely to Succeed in Showing Trademark Infringement Is a Further Basis to Conclude That There Is No Irreparable Harm**

There is no trademark infringement where, as here, Reebok is authorized to continue to use individual players' names and numbers for a period of time following the end of the term of the License Agreement.  Here, as in *Sasson Jeans, Inc. v. Sasson Jeans, L.A., Inc.,* 632 F. Supp. 1525, 1526 (S.D.N.Y. 1986), it is respectfully submitted that the Court should deny Plaintiffs' request for an injunction because of the continuing nature of Reebok's right to sell jerseys during the sell-off period provided in the License Agreement.  *See Sasson Jeans,* 632 F. Supp. at 1529 ("It is the existence of this continuing imprimatur from [plaintiff] which renders the goods 'genuine'....  Plaintiff has therefore failed to demonstrate irreparable injury stemming from consumer confusion about the source of the Sasson jeans....")

**III.**   **Nike Has Failed to Show That the Balance of Hardships Tips in Its Favor**

There is little doubt -- and certainly no contrary evidence -- that Nike does not plan to market NFL jerseys until the end of April.  As such, the sales of the New York Jet/Tebow apparel by Reebok to retailers in March for sale to consumers in April is highly unlikely to have any negative effect on Nike.  Moreover, even if it can be assumed that the sales of the Reebok garments in March might reduce Nike sales -- a highly speculative proposition that it is unlikely Nike could ever prove -- any loss of sales could be readily compensated by an award of money damages.

If the injunction is denied, Nike would be able to execute its current business plan, and nothing would change.  By contrast, if the injunction is granted, Reebok would be required to recall (and issue credits for) the Tebow jerseys and t-shirts that it sold to retailers in

March. These items would have no value and would presumably have to be destroyed. In these circumstances, it is respectfully submitted that the issuance of the injunction would do more harm to Reebok than denial of the injunction would do to Nike.

**IV.      Nike Has Failed to Show That the Public Interest Would Be Served By the Issuance of a Preliminary Injunction**

In the event that injunctive relief is granted here, the effect would be to remove from the market the only authorized Tebow/New York Jets apparel that will be available for sale to members of the public until late April when Nike starts its own sales. At the TRO hearing, the Court stated that the absence of the Tebow jerseys from the market is "a matter of rather minimal impact so long as the Tim Tebow merchandise will be on the market in near term." (March 28 Tr. 28:22-24.) However, given that the deposition testimony has made clear that the Nike products will not be on the market for almost another month (Gordon Deposition Transcript [Friedman Aff., Exh. D] -- and given that only a very small portion of the garments sold by Reebok bear its own name or logo -- it is respectfully submitted that the Court should reconsider this issue.

## CONCLUSION

The preliminary injunction analysis is basically one of balancing -- the relevant factors must be considered in conjunction with (rather than in isolation from) each other. In fact, the Court recognized as much when it concluded that its preliminary finding that Nike would probably succeed on the merits had a causal relationship to its finding of irreparable injury. (March 28 Tr. 28:3-5.)

It is respectfully submitted that the same analysis should work in reverse as well. If it is found that Nike has failed to show a likelihood of success on the merits or irreparable injury. That failure makes it harder for Nike to satisfy the other elements of preliminary

14

injunctive relief as well.  Here, as discussed above, Nike can satisfy none of the requisite elements.

Dated: New York, New York
      April 3, 2012

                    STILLMAN & FRIEDMAN, P.C.

                    By _____
                         Julian W. Friedman
                    425 Park Avenue
                    New York, New York 10022
                    212-223-0200 - Phone

                    *Attorneys for Defendant Reebok International Ltd.*